1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CRYSTAL EUGENE JONES,

11            Petitioner,                    No. CIV S-04-1082 MCE KJM P

12       vs.

13    JOE MCGRATH,

14            Respondent.                FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus under 28 U.S.C. § 2254.  He raises four claims of error: (1) the trial court's denial of his

18   motion to replace trial counsel effectively violated his right to effective assistance of counsel;

19   (2) the trial court's refusal to include a jury instruction on the claim-of-right defense to robbery

20   denied him a fair trial; (3) his right to confront witnesses was violated by the trial court's

21   admission into evidence of co-defendant's hearsay statements to co-defendant's mother; and

22   (4) the trial court's failure to instruct the jury on accomplice testimony denied him a fair trial.

23   Additionally, petitioner argues that these four claims, taken as a whole, represent cumulative

24   error, each error reinforcing the prejudicial effect of the others.

25   /////

26   /////

1

I. Factual And Procedural Background

Petitioner was convicted by jury in Sacramento County of one count of first degree murder.  Answer, Ex. A (Abstract of Judgment).  The jury also determined that petitioner committed the murder during the course of a robbery, personally used a knife in committing the murder, and was armed with a firearm.  Id.  Petitioner was sentenced to life in prison without the possibility of parole, plus one year for use of the knife.  Id.

The state Court of Appeal recounted the facts as developed at trial:

> Jones and Barr resided in a Sacramento home along with the victim Randall and another man known as BJ, later identified as Benjamin Hence.  Jones was known as "Rollo."  Barr was known as "Mellow."  Barr's girlfriend, Charla Barnes, also stayed at the house.  Barr's best friend, Lawrence "Mo" Cannon, frequented the house.

> Prior to February 16, 1999, Barnes had heard Barr complain to Jones and Mo that Barr had given Randall money on more than one occasion to buy crack cocaine for him, but Randall had not produced the drugs.  Barr was mad about this situation.  Jones commented Randall "had to pay."

> On February 16, 1999, Barr, Randall, BJ, and an unidentified male were home playing dominoes in the kitchen.  Jones and Barnes were also present.  Barnes noticed Jones rubbing a kitchen knife in the palm of his hand.  She commented to Barr about it.  Barr looked at Jones, who then stopped handling the knife.  Barr told Barnes, "Don't worry about him."

> Barr and Barnes then left the game and went upstairs to Barr's bedroom.  About two hours later, Barr told Barnes she had to leave the house.  Barnes refused because she believed Barr wanted her to leave so he could bring another woman to the house.  Frustrated, Barr left the room and went downstairs.

> Lying in bed, Barnes then heard a sound like somebody was out of breath and in pain.  She heard Randall repeat over and over, "Mellow, don't do this.  Mellow, I love you.  You can have everything you want."  Randall sounded scared, breathless, and in pain.

/////

/////

/////

2

It was approximately 3:00 a.m. Barnes went downstairs to see what was happening.  There, she saw Randall bent over, on his knees, head toward the ground.  Blood was on his posterior.  She saw Jones stabbing Randall with a bloody knife.  Randall flinched and moaned.  Twice, Barr yelled at Barnes to go back upstairs.  Barnes saw blood on the carpet and then ran upstairs.

Once in the room, Barnes sat down in a corner and cried.  She peeked outside a window and saw BJ running across the front yard but looking back towards the house.  She heard Randall crying and asking God to help him and to forgive him.  She heard Randall asking Jones, "Why are you doing this, Rollo?"

A minute or two later, the noises from downstairs ceased, and all was quiet.  She thought she heard someone coming up the stairs.  She hid in a closet, fearing the person might hurt her.  About 10 minutes passed; no one came upstairs.  Then Mo yelled, "Is anybody up there?"  Eventually, Barnes replied.  Mo assured her he was not going to hurt her.  He came upstairs and asked where the others were.  Barnes did not know.  Mo told her to stay upstairs.  He went downstairs, then returned with Jones and Barr.  Mo suggested they all leave the house together, which they did.  Barnes saw blood on the living room carpet and sofa as they made their way out.

As they walked down an alley, BJ approached them and said he had not told anyone.  Jones complained "the bastard wasn't dead yet."  Mo asked BJ where his gun was, and BJ replied it was back at the house in his bedroom.

The five returned to the house.  Barr escorted Barnes to the upstairs bedroom, then went downstairs.  Moments later, Barnes heard two gunshots coming from the back yard.  Barnes screamed, and eventually cried herself to sleep.

A few days after the killing, Jones met with a friend and fellow drug-user, Paul Davis, and admitted involvement in Randall's death.  He admitted stabbing Randall, but said either Barr or Mo had shot Randall.  He stated afterwards they took drugs and some of Randall's belongings.

Meanwhile, on February 18, 1999, Barr admitted his involvement in the murder to his mother, Theresa Rosemary Brown.  Barr told her after Randall had been stabbed, Randall yelled out for BJ.  When Barr went to cover Randall's mouth to stop him from screaming, Randall bit Barr's finger.  Barr then shot Randall in the head.

/////

/////

3

1
2
3

> Brown saw what looked like a bite mark on Barr's finger.  When
> Barr was arrested on February 22, 1999, police observed and
> photographed a cut on Barr's finger.  Barr told police he shot
> Randall in self-defense.

4  Answer, Ex. B (Court of Appeal Opinion of March 19, 2003 ("Opinion")) at 3-5.

5  II.  AEDPA Standards

6           An application for a writ of habeas corpus by a person in custody under a

7  judgment of a state court can be granted only for violations of the Constitution or laws of the

8  United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

9  claim decided on the merits in state court proceedings unless the state court's adjudication of the

10  claim:

11
12

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established federal law, as
> determined by the Supreme Court of the United States; or

13
14

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

15  28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro,

16  365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

17  under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

18  Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

19  U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

20  not address the merits of petitioner's Eighth Amendment claim).[1]  Courts are not required to

21  address the merits of a particular claim, but may simply deny a habeas application on the ground

22

23
24
25
26

---

[1]  In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals
held in a § 2254 action that "any independent opinions we offer on the merits of constitutional
claims will have no determinative effect in the case before us . . .  At best, it is constitutional
dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain
relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title
28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation
of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71;
Ramirez, 365 F.3d at 773-75.

1   that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

2   Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

3   courts to review state court decisions for error before determining whether relief is precluded by

4   § 2254(d).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

5   by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

6          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

7   different.  As the Supreme Court has explained:

8              A federal habeas court may issue the writ under the "contrary to"
               clause if the state court applies a rule different from the governing
9              law set forth in our cases, or if it decides a case differently than we
               have done on a set of materially indistinguishable facts.  The court
10             may grant relief under the "unreasonable application" clause if the
               state court correctly identifies the governing legal principle from
11             our decisions but unreasonably applies it to the facts of the
               particular case.  The focus of the latter inquiry is on whether the
12             state court's application of clearly established federal law is
               objectively unreasonable, and we stressed in Williams [v. Taylor,
13             529 U.S. 362 (2000)] that an unreasonable application is different
               from an incorrect one.

14

15   Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

16   law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

17   fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

18   (2002).

19          The court will look to the last reasoned state court decision in determining

20   whether the law applied to a particular claim by the state courts was contrary to the law set forth

21   in the cases of the United States Supreme Court or whether an unreasonable application of such

22   law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court fails

23   to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional

24   or federal law, the Ninth Circuit has held that this court must perform an independent review of

25   the record to ascertain whether the state court decision was objectively unreasonable.  Himes v.

26   Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  In other words, the court assumes the state court

1  applied the correct law, and analyzes whether the decision of the state court was based on an

2  objectively unreasonable application of that law.

3         It is appropriate to look to lower federal court decisions to determine what law has

4  been "clearly established" by the Supreme Court and the reasonableness of a particular

5  application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

6  III.  Denial of Petitioner's Marsden Motion

7         In petitioner's first claim of error, he alleges that the trial court improperly denied

8  his Marsden[2] motion to replace trial counsel, thus denying him the right to effective counsel in

9  violation of the Sixth and Fourteenth Amendments.  Pet. at 4.

10       A.  Background

11       At a hearing held on December 20, 2000, Jones requested the court replace his

12 trial counsel because counsel was "not proving my commands in this case."  12/20/00 RT 2.[3]

13 Petitioner stated that he argued with counsel about counsel's performance, and that counsel did

14 not want to defend him or work with him.  Id.  Petitioner also stated that counsel told him that

15 counsel had not studied the case because he was very busy with other cases, as well as

16 recreational activities such as "going to the mountains."  Id. at 1-2.

17       Petitioner's counsel responded that he was not ready to go to trial as of the date of

18 petitioner's motion.  However, counsel believed he would be prepared for trial by the February 6,

19 2001 trial date, and also understood that co-defendant's counsel would not be ready by the trial

20 date.  Id. at 2.  Counsel stated that his ability to research and investigate petitioner's case had

21 been somewhat hampered by his obligation to care for his daughter, who had recently injured her

22 knee.  Id. at 4-5.  However, under questioning from the court, counsel stated that he believed he

23 could still competently represent petitioner.  Id.

24

25       [2]  People v. Marsden, 2 Cal.3d 118 (1970).

26       [3]  These proceedings were held in chambers and sealed.  The sealed transcript has been
provided to this court by the Court of Appeal.

1      Petitioner's counsel went on to discuss the nature of his disagreement with

2  petitioner:

3          I did also tell him, however, I have told him to think about what we
           had a disagreement about.  We certainly have had disagreements.
4
           I mean he has a very difficult case, and I have frankly told him
5          what he doesn't like to hear and that he's probably going to lose,
           for example.
6
           There really isn't a whole lot I can do.  I don't think he's been
7          telling me the truth about his case.  I think if he were to do that,
           he'd perhaps help me out a little bit.
8

9  Id. at 3-4.

10     On the basis of this testimony, the court denied petitioner's motion to replace

11  counsel.  In doing so, the court advised Mr. Jones:

12         You're facing serious charges here, and Mr. Combatalade may not
           always be telling you things you want to hear, but that alone is not
13         a reason why he's not being a good lawyer.

14         A lot of times -- what you need right now is someone to let you
           know what's up on this case.  It sounds to me that's what he's
15         doing.  So he's fighting for you, and I'm going to advise you to
           work with him and do your best to let him know what kind of
16         defense he can put on for you.

17         Now, he's going to tell you too that he can't put on any lies in
           court.  So the best thing for you to do is tell him the truth and let
18         him make a defense out of what you tell him.

19  Id. at 6.

20     Considering this issue on appeal, the Court of Appeal held that the trial court did

21  not abuse its discretion in denying petitioner's Marsden motion:

22         The evidence on the record demonstrates Jones and counsel argued
           over how best to defend Jones.  Jones claimed counsel would not
23         "work with" him, but counsel explained he could not perform his
           job if Jones would not tell him the truth.  "Tactical disagreements
24         between the defendant and his attorney do not by themselves
           constitute an 'irreconcilable conflict.'  'When a defendant chooses
25         to be represented by professional counsel, the counsel is "captain
           of the ship" and can make all but a few fundamental decisions for
26         the defendant.' [Citation]."  [].

7

1            Moreover, "a defendant may not force the substitution of counsel
     by his own conduct that manufactures a conflict."  [].  The conflict
2    here arose because Jones would not cooperate with his counsel.
     The evidence strongly suggested Jones committed the alleged
3    crimes.  His counsel thus likely decided arguing theories not
     supported by the weight of the evidence would not serve Jones
4    well.  This displeased Jones, but it did not render the disagreement
     irreconcilable or the representation ineffective.
5
             Furthermore, counsel's obligation to care for his injured daughter
6    appears to have caused defendant no prejudice.  When the case
     actually went to trial, counsel was ready to proceed.  The trial court
7    thus did not abuse its discretion by denying Jones's Marsden
     motion.
8

9    Answer, Ex. B at 8-9.

10        B.  Analysis

11           A criminal defendant has the right to the effective assistance of counsel.  McMann

12   v. Richardson, 397 U.S. 759, 771 n.14 (1970).  Nevertheless,

13           there is no automatic right to a substitution of counsel simply
     because the defendant informs the trial court that he is dissatisfied
14   with appointed counsel's performance.

15           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

16           A trial judge is required to order a substitution of counsel if, after a
     hearing, it is demonstrated that there is a breakdown in the
17   attorney-client relationship or that an actual conflict of interest
     existed.
18

19   Jackson v. Ylst, 921 F.2d 882, 888 (9th Cir. 1990) (quotations omitted).  A disagreement over

20   tactics does not signal the sort of breakdown requiring the appointment of different counsel.

21   United States v. Porter, 405 F.3d 1136, 1140 (10th Cir.), cert. denied, 546 U.S. 980 (2005)

22   ("[g]ood cause for substitution of counsel consists of more than a mere strategic disagreement

23   between a defendant and his attorney. . . .").

24           The Ninth Circuit has explained that "not every conflict or disagreement between

25   the defendant and counsel implicates Sixth Amendment rights."  Schell v. Witek, 218 F.3d 1017,

26   1027 (9th Cir. 2000) (en banc).  The right to effective assistance may be compromised, however,

1   if there is a "breakdown of a relationship between attorney and client from irreconcilable

2   differences. . . ." United States v. Moore, 159 F.3d 1154, 1158 (9th Cir. 1998).  The "[l]oss of

3   confidence by the defendant in his counsel weighs heavily in the defendant's favor when he seeks

4   to substitute counsel," unless the breakdown in the relationship flows from the defendant's own

5   conduct.  Hudson v. Rushen, 686 F.2d 826, 832 (9th Cir. 1982).

6           Finally, the Ninth Circuit has observed:

7           the ultimate constitutional question the federal courts must answer
            here is not whether the state trial court "abused its discretion" in
8           not deciding [defendant's] motion, but whether this error actually
            violated [defendant's] constitutional rights . . . [and] resulted in a
9           . . . significant impediment that resulted in turn in an
            attorney-client relationship that fell short of that required by the
10          Sixth Amendment.

11  Schell, 218 F.3d at 1026.

12          The state Court of Appeal did not apply this body of law unreasonably in reaching

13  its decision on petitioner's claim that the failure to provide him substitute counsel violated his

14  constitutional rights.  First, petitioner was vague about the tactical disagreements he had with

15  counsel: he did not identify any particular line of investigation or research that counsel had not

16  pursued.  Second, any breakdown in communication seemed to flow from petitioner's refusal to

17  be totally honest with counsel and his refusal to credit counsel's assessment of the difficulties of

18  the case.  Third, although counsel was indeed busy with other activities, including his daughter's

19  care, petitioner has not shown how these activities interfered with petitioner's right to the

20  effective assistance of counsel given counsel's representation that he would be ready for trial

21  when it started.

22  IV.  Testimony of Theresa Brown

23          In petitioner's third claim of error, he argues that the trial court improperly

24  admitted the testimony of Theresa Brown, the mother of petitioner's co-defendant, Nathan Barr.

25  Pet. at 6.  Brown testified as to statements made to her by Barr on two separate occasions, and

26  portions of these statements tended to implicate petitioner in the crime.  See RT 328-329 (Barr

told Brown that "a roommate stabbed [Randall] in the neck").  Petitioner alleges that the

admission of Barr's hearsay statements against petitioner violated his rights under the Sixth

Amendment's confrontation clause.

A.  Background

The Court of Appeal describes the facts surrounding Barr's conversation with

Brown as follows:

> Brown testified that on February 17, 1999, she saw her son at the
> home of Barr's estranged wife and he looked afraid.  Barr asked
> her if she had heard anything about a body being found in an alley
> that day.  She had not.  That evening, the television news ran a
> story about a body found in an alley, and broadcast a picture of the
> victim.  Brown, who was watching that program, recognized the
> victim as Randall, one of her son's roommates.
>
> The following day, Barr went to Brown's house and told her he had
> shot and killed Randall.  He had not acted alone.  Barr said
> someone else had stabbed Randall in the neck, and Randall
> screamed.  Barr said he tried to put his hand over Randall's mouth
> to keep him from screaming, but Randall bit Barr's finger.  Barr
> said once "this other guy" stabbed Randall in the neck and Randall
> was going to bleed to death anyway, he put Randall out of his
> misery and shot him in the head.
>
> Brown asked Barr who the others were and where they were.  Barr
> didn't give names, but he said "one guy was roaming Oak Park
> somewhere scared to death."  He did not know where the other
> person was located.  Brown asked Barr why he did it.  Barr said
> something to the effect his roommate was "fucking him over and
> trying to get his house from him."  Barr told his mother he was
> sorry, but continued saying he did it.  Barr also told Brown when
> the other person first stabbed Randall, Randall yelled out for BJ.

Answer, Ex. B at 13-14.

Petitioner's trial counsel objected to the admission of this testimony against

petitioner on hearsay and confrontation clause grounds.  RT 27.  The trial court held the

statements were admissible as declarations against interest under California Evidence Code

§1230.  Id. at 28.  On the confrontation clause issue, the trial court admitted the statement

applying the Supreme Court's analysis from Idaho v. Wright, 497 U.S. 805 (1990) and Lilly v.

Virginia, 527 U.S. 116 (1999).  Id. at 29, 32-34.  Although a declaration against interest is not a

firmly rooted hearsay exception, the trial court found that the statements were sufficiently

trustworthy.  The Court of Appeal affirmed on largely the same grounds.  Addressing the

statements' particularized guarantees of trustworthiness, the court noted the following:

> The statements were made within a day or two of the murder.  Barr
> appeared at his estranged wife's house on his own volition.  He
> spoke spontaneously and voluntarily, without coercion or leading
> by his mother.  When Barr spoke with his mother the second time,
> he spoke in the privacy and safety of his mother's home.  The two
> days of statements were consistent with each other.  There was no
> evidence he made the statements while under the influence of
> alcohol or drugs.  There was no indication that Barr believed law
> enforcement considered him to be a suspect.
>
> Although Barr stated he was not alone in acting, he did not try to
> shift responsibility for the shooting by name to anyone else.  He
> repeated he was the person who shot Randall.  He had no apparent
> motive to lie to his mother.

Answer, Ex. B at 20.

    B.  Analysis

       The Sixth Amendment to the United States Constitution, made applicable to the

states by the Fourteenth Amendment, provides in part that, "In all criminal prosecutions, the

accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const.

amend. VI.  The Confrontation Clause precludes admission of hearsay evidence against a

criminal defendant unless the prosecution can demonstrate that the statement contains adequate

indicia of reliability.  Ohio v. Roberts, 448 U.S. 56, 66 (1980).[4]  Reliability may be inferred,

without more, if the evidence is admitted based on a firmly rooted hearsay exception.  White v.

Illinois, 502 U.S. 346, 356-57 (1992); Wright, 497 U.S. at 819-20.

/////

---

[4] The Supreme Court's decision in Crawford v. Washington substantially changed
Confrontation Clause analysis, shifting analysis away from indicia of reliability and focusing
instead on whether a statement is "testimonial."  541 U.S. 36, 59 (2004).  However, Crawford is
not retroactive, Whorton v. Bockting, __ U.S. __, 127 S. Ct. 1173 (2007), and was decided after
the events in this case took place.  Thus, the court engages in pre-Crawford analysis in
considering petitioner's claim.

Absent a firmly rooted hearsay exception, the evidence will be presumed to violate the Confrontation Clause, and should be excluded absent a showing of particular guarantees of trustworthiness such that adversarial testing would add little, if anything, to the statement's reliability. <u>White</u>, 502 U.S. at 356-57. Whether such guarantees of trustworthiness exist must be determined by examining the "totality of the circumstances . . . that surround the making of the statement and that render the declarant particularly worthy of belief." <u>Wright</u>, 497 U.S. at 819-20. Courts have considerable leeway in their consideration of appropriate factors of trustworthiness. <u>Id</u>. at 822. However, other corroborating evidence presented at trial may not be used to prove a statement's reliability. <u>Id</u>. at 821-23.

"[A]ccomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." <u>Lilly</u>, 527 U.S. at 134. Thus, the court must assume that these statements are unreliable, and exclude them absent particularized guarantees of trustworthiness. In <u>Lilly</u>, the Supreme Court held such a statement did not contain such guarantees where the statement was made by a non-testifying co-defendant while he was in custody, while he was under the influence of alcohol, and in response to police officers' leading questions, and where the declarant's testimony tended to shift blame onto the defendant. <u>Id</u>. at 139.

The particular circumstances surrounding Barr's statements to his mother all suggest that these statements are trustworthy. Barr was not in police custody when making the statements. He made the statements spontaneously and voluntarily, rather than responding to leading questions as did the defendant in <u>Lilly</u>. Perhaps most importantly, Barr did not attempt to shift responsibility away from himself even though, speaking to his own mother, he would have had every motivation to do so. Brown testified that she told Barr he could not have killed his roommate because, in her view, Barr was not capable of such a thing. Corrected Clerk's Transcript 6. However, Barr repeatedly told Brown that, in fact, he had shot Randall in the head. <u>Id</u>.

1    Furthermore, the jury received both an admonition and an instruction, generally

2    calling the jurors' attention to the fact that petitioner did not have the opportunity to cross-

3    examine Barr, and that the jury could consider that circumstance in determining what weight, if

4    any, to give the statements.  RT 364-365, 1052; CT 254.

5    The state court did not apply federal law unreasonably in determining that Barr's

6    statements to his mother contained particularized guarantees of trustworthiness sufficient to

7    satisfy the test set forth in Lilly.  The state courts did not act unreasonably or contrary to

8    established federal law in admitting these statements over petitioner's confrontation clause

9    objections.

10   V.  Jury Instructions

11   Petitioner's second and fourth claims of error both deal with the trial court's

12   failure to give certain jury instructions.  In his second claim of error, petitioner argues that the

13   trial court improperly denied his request to include a claim-of-right jury instruction as to the

14   robbery charge.  Pet. at 4-5.  In his fourth claim of error, petitioner further argues that the trial

15   court erred in not giving certain jury instructions relating to accomplice testimony.  Id. at 6.

16   Claims of error in state jury instructions are generally a matter of state law and

17   thus do not usually invoke a constitutional question.  Hayes v. Woodford, 301 F.3d 1054, 1086

18   (9th Cir. 2002).  It is not the province of a federal habeas court to reexamine state court

19   determinations of state law questions.  Estelle v. McGuire, 502 U.S. 62, 68 (1991); Gilmore v.

20   Taylor, 508 U.S. 333, 348-49 (1993).

21   In order to warrant federal habeas relief, a challenged jury instruction cannot be

22   merely "undesirable, erroneous, or even universally condemned, but must violate some due

23   process right guaranteed by the Fourteenth Amendment."  Cupp v. Naughten, 414 U.S. 141, 146

24   (1973).  A violation of due process occurs if a trial is fundamentally unfair.  Estelle, 502 U.S. at

25   72-73; Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988).  In making this determination, a

26   reviewing court should not view the challenged instruction in isolation, but must consider it in

1  the context of the instructions as a whole and the entire trial process.  Id.  Because the omission

2  of an instruction is less likely to be prejudicial than a misstatement of the law, a habeas petitioner

3  whose claim involves a failure to give a particular instruction bears an especially heavy burden.

4  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  If the court does find constitutional error, the

5  court must also find that the error had a substantial and injurious effect or influence in

6  determining the jury's verdict before granting relief in habeas proceedings.  See Calderon v.

7  Coleman, 525 U.S. 141, 146-47 (1998).

8      A.  Claim-of-Right Jury Instruction

9          1.  Background

10      Petitioner argues that he was entitled to jury instruction CALJIC No. 9.44,[5] which

11  instructs as to a claim-of-right defense to a robbery charge.  Pet. at 5-6.  Petitioner requested the

12  instruction based upon the theory he had a good faith belief in his right to take possession of the

13  victim's clothing, money, and drugs in order to recover a debt owed to him by the victim.  RT

14  745.  The trial court refused petitioner's request on the grounds that the evidence presented at

15  trial was insufficient to warrant the instruction.  Id. at 746-748.

16      The Court of Appeal affirmed the trial court's decision not to grant the claim-of-

17  right instruction.  Addressing the sufficiency of the evidence, the court stated:

18      Here, no substantial evidence in the record discloses Jones's intent
       on attacking Randall was limited to recovering money allegedly
19      owed him.  Before Barnes went downstairs after hearing Randall's
       sounds of pain, she heard Randall say, "Mellow [Barr], don't do
20      this.  Mellow, I love you.  *You can have everything you want*."
       (Italics added.)  After hearing this, Barnes came down the stairs
21      and saw Jones stab Randall while Randall was on his knees with
       his head down.  If Jones's intent was simply to recover what he
22      believed was his, he had no reason to stab Randall after Randall,

23

24      [5]  CALJIC No. 9.44 states, in pertinent part:  "An essential element of the crime of
       robbery is a specific intent permanently to deprive the alleged victim of his or her property.  That
25      specific intent does not exist if the alleged perpetrator had a good faith claim of right to title or
       ownership of the specific property taken from the alleged victim.  In other words, if a perpetrator
26      seeks to regain possession of property in which he honestly believes he has a good faith claim of
       ownership or title, then he does not have the required criminal intent."

who was not resisting at that point, stated he and Barr could have everything they wanted.

Moreover, after stabbing Randall three times and dragging him outside, Jones complained to his friends "the bastard wasn't dead yet," and asserted someone had to "take [Randall] out of his misery." These statements and Jones's stabbing after Randall said he could have everything disclose Jones's intent went far beyond simply recovering money he or Barr allegedly paid to Randall. No substantial evidence supports an inference otherwise. The trial court did not err in refusing to give a claim-of-right instruction in support of Jones's defense.

Answer, Ex. B at 12.

### 2. Analysis

Due process requires "criminal defendants be afforded a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984). A defendant is generally entitled to have the jury instructed on a defense theory, but whether a constitutional violation has occurred in the failure to do so depends upon the evidence in the case and the overall instructions given to the jury. Duckett v. Godinez, 67 F.3d 734, 745 (1995). There must be some evidence to support the instruction in order for there to be a duty to instruct. Id. at 743. Thus, in order to determine whether or not due process has been violated, the court must examine whether there was evidence sufficient to support a duty under state law to instruct on a claim-of-right in this case.

/////

/////

/////

/////

/////

/////

/////

/////

15

In <u>People v. Butler</u>, the California Supreme Court held:

> It has long been the rule in this state and generally throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent. A belief that the property taken belongs to the taker, or that he had a right to retake goods sold is sufficient to preclude felonious intent. Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he has a right or claim to it.

65 Cal.2d 569, 573 (1967) (citations omitted).[6]  However, the claim-of-right defense is not available where the claim of right to the property is based upon a notoriously illegal transaction. <u>People v. Hendricks</u>, 44 Cal.3d 635 (1988) (disallowing claim in a fee collection for prostitution); <u>People v. Gates</u>, 43 Cal.3d 1168 (1987) (disallowing claim in a forgery ring proceeds case); <u>People v. Johnson</u>, 233 Cal.App.3d 425 (1991) (disallowing claim in a drug transaction case).  The claim-of-right defense is not available where the claimed debt is uncertain and subject to dispute.  <u>People v. Barnett</u>, 17 Cal.4th 1044, 1146 (1998).  In addition, the claim-of-right jury instruction is not required where the record discloses no substantial evidence that the defendant's intent in attacking the victim was limited to taking either the property defendant believed was his or property of equivalent value.  <u>Sakarias</u>, 22 Cal.4th at 622 (applying pre-<u>Tufunga</u> law); <u>see also</u> <u>Barnett</u>, 17 Cal. 4th at 1145 (claim-of-right defense not available where defendant "simply seized whatever items of value" he could get from robbery victims); <u>People v. Alvarado</u>, 133 Cal. App. 3d 1003, 1022 (1982) (no claim-of-right instruction required where defendants "conducted a general ransacking of the bedroom indiscriminately taking items of value never specifically related to any claim of right.").

/////

---

[6]  In <u>People v. Tufunga</u>, 21 Cal.4th 935 (1999), the California Supreme Court partially overruled <u>Butler</u>, holding that the claim-of-right defense did not extend to forcible takings perpetrated to settle or otherwise collect a debt, liquidated or unliquidated.  However, the <u>Tufunga</u> decision is not retroactive, <u>People v. Sakarias</u>, 22 Cal.4th 596, 622 (2000), and was decided approximately nine months after the crimes in the instant case were committed.  Thus, the court uses pre-<u>Tufunga</u> law in assessing petitioner's claim.

16

1    The trial court's refusal to instruct the jury on a claim-of-right defense does not

2 violate state law.  Although there was testimony suggesting an unpaid debt as a motive for

3 attacking the victim, petitioner offered no evidence of a specific amount in dispute, no evidence

4 of a refusal to pay by the victim, and no evidence that the items taken from the victim were of

5 equivalent value to the alleged unpaid debt.  Furthermore, the references in the record to an

6 unpaid debt all seem to suggest that debt was based on petitioner's or co-defendant's payment to

7 the victim in exchange for drugs the victim never provided.  See RT 96 (Barnes testifies that

8 "Nathan was mad because he gave James some money more than once to get him some dope for

9 him, and he didn't come through.").  In sum, the evidence in this case suggests, at most, a debt of

10 uncertain amount based on an illegal transaction.  Moreover, there is no evidence to suggest

11 petitioner's intent was limited by a desire to retake items of equivalent value to the unpaid debt.

12    Thus, the court finds that the Court of Appeal's rejection of petitioner's claim-of-

13 right argument was not contrary to or an unreasonable application of clearly established federal

14 law.  The state courts did not violate petitioner's due process right to present a complete defense

15 by refusing to give him a jury instruction to which he was not entitled based on the evidence.

16    B.  Instructions on Accomplice Testimony

17    1.  Background

18    Near the conclusion of petitioner's trial, petitioner's counsel met with the

19 prosecutor and the judge to discuss proposed jury instructions.  At that time, petitioner's counsel

20 did not request any jury instructions dealing with accomplice testimony, and the court did not

21 include any such instructions.  At the conclusion of the jury instruction conference, petitioner's

22 counsel stipulated generally that the finalized instructions "constitute the entire package

23 submitted by both sides, that there were no instructions that were requested and refused other

24 than [petitioner's request for a claim-of-right instruction], and that the instructions selected by

25 both sides take into consideration all tactical considerations and decisions."  RT 748.

26 /////

On direct appeal, appellant argued that the trial court committed prejudicial error in failing to instruct the jury on accomplice testimony under CALJIC nos. 3.10, 3.11 and 3.18.[7] In reviewing this claim, the Court of Appeal first noted that the trial court had a duty to instruct on accomplice testimony based on California Penal Code §1111 and People v. Zapien, 4 Cal.4th 929, 982 (1993).  Answer, Ex. B at 24-25.

However, the court held petitioner was not harmed by this failure under the doctrine of invited error, which bars a defendant from challenging an instruction given by the trial court when the defendant has made a conscious and deliberate tactical choice in acceding to the given instructions.  Answer, Ex. B at 25; see People v. Lucero, 23 Cal. 4th 692, 723-24 (2000).  "The issue centers on whether counsel deliberately caused the court to fail to fully instruct. . . ." People v. Wickersham 32 Cal.3d 307, 335 (1982), disapproved on other grounds, People v. Barton, 12 Cal. 4th 186, 201 (1995).  Turning to the facts of the case, the Court of Appeal stated:

> Here, the record discloses the defense attorneys did not submit any instructions to the court regarding accomplice testimony, and the attorneys agreed on record their failure to do so resulted from taking all tactical considerations and decisions.  By so agreeing, the defense attorneys in effect disclosed a conscious and deliberate decision not to request accomplice instructions for tactical reasons.  The People posit reasonable tactical purposes why defense counsel

[7]  CALJIC No. 3.10 defines "accomplice:"  "An accomplice is a person who is subject to prosecution for the identical offense charged [in Count[s] ___] against the defendant on trial by reason of [aiding and abetting] [or] [being a member of a criminal conspiracy]."

CALJIC No. 3.11 requires corroboration of accomplice testimony:  "You cannot find a defendant guilty based upon the testimony of an accomplice unless that testimony is corroborated by other evidence which tends to connect [the] [that] defendant with the commission of the offense.  [¶] [Testimony of an accomplice includes any out-of-court statement purportedly made by an accomplice received for the purpose of proving that what the accomplice stated out-of-court was true.]"

CALJIC No. 3.18 instructs the jury to view accomplice testimony with caution:  "To the extent that an accomplice gives testimony that tends to incriminate the defendant, it should be viewed with caution.  This does not mean, however, that you may arbitrarily disregard that testimony.  You should give that testimony the weight you think it deserves after examining it with care and caution and in light of all the evidence in this case."

18

did not request accomplice testimony instructions.  Barr did not
want to be identified as Jones's accomplice in the robbery
committed by Jones.  Similarly, Jones did not want to be identified
as Barr's accomplice in the fatal shooting committed by Barr.
Indeed, Jones's attorney argued Jones was guilty of assault with a
deadly weapon and should be acquitted of murder.

Answer, Ex. B at 25-26; see RT 748 (counsel's stipulation that the instructions were proposed or

omitted for tactical reasons).

2.  Analysis

In the instant petition, petitioner argues that the failure to instruct the jury under

CALJIC nos. 3.10, 3.11 and 3.18 violated his rights under the Fifth and Fourteenth Amendments

by denying him a fair trial.  Respondent argues that there is no duty under federal law to instruct

on accomplice testimony, and in the alternative, that the Court of Appeal's reliance on invited

error acts as procedural default, precluding habeas review by this court.

Invited error constitutes a procedural bar to review by a habeas court.  See Leavitt

v. Arave, 383 F.3d 809, 832-33 (9th Cir. 2004), cert. denied, 545 U.S. 1105 (2005) (stating

"[t]here is no reason that we should treat the invited error rule differently from other state

procedural bars").  A federal court will not review a claim of federal constitutional error raised by

a state habeas petitioner if the state court's determination of the same issue "rests on a state law

ground that is independent of the federal question and adequate to support the judgment."

Coleman v. Thompson, 501 U.S. 722, 729 (1991).

In this case, respondent has raised the procedural bar, in somewhat abbreviated

form, yet petitioner has not addressed the issue.  The procedural bar may be a sufficient bar to

federal review of the claim.

Whether or not the bar is adequate and independent, however, the claim fails on

the merits.  Lambrix v. Singletary, 520 U.S. 518 (1997).  Independent corroboration of

accomplice testimony is not constitutionally mandated nor does the failure to give cautionary

accomplice instructions implicate the United States Constitution.  See United States v.

1  Augenblick, 393 U.S. 348, 352 (1969) ("When we look at the requirements of procedural due

2  process, the use of accomplice testimony is not catalogued with constitutional restrictions").  It

3  has long been established in federal law that "the uncorroborated testimony of an accomplice is

4  enough to sustain a conviction unless it is incredible or insubstantial on its face."  United States

5  v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993); United States v. Lopez, 803 F.2d 969, 973

6  (9th Cir. 1986).  "If uncorroborated accomplice testimony is sufficient to support a conviction

7  under the Constitution, there can be no constitutional right to instruct the jury that it must find

8  corroboration for an accomplice's testimony."  Takacs v. Engle, 768 F.2d 122, 127 (6th Cir.

9  1985).

10         Thus, the state court's failure to adhere to California's higher standards with

11  regard to accomplice testimony does not violate federal law unless the testimony was incredible

12  or insubstantial on its face.  Necoechea, 986 F.2d at 1282.  As discussed above, see page 12

13  supra, Barr's statements to his mother contained particular indicia of reliability.  Therefore, the

14  court concludes they were not incredible or insubstantial, and the failure to issue the necessary

15  instructions under California law did not violate any federal or constitutional law.

16         Even assuming this failure to instruct did implicate federal law, the error could not

17  have had a substantial or injurious effect on the outcome, given the entirety of the jury

18  instructions and the evidence in this case.  Although the giving of CALJIC nos. 3.10, 3.11 and

19  3.18 would have placed more scrutiny on the accomplice testimony in this case, petitioner has

20  not shown that the failure to give the instructions prejudiced him in any significant way.  For

21  example, CALJIC no. 3.11 instructs jurors not to convict a defendant based solely on

22  uncorroborated accomplice testimony.  However, the accomplice testimony in the present case -

23  Barr's statements to his mother - was in fact corroborated by the eyewitness testimony of Barnes

24  and by petitioner's own statements to Davis.  There was no significant danger that the jury would

25  convict on uncorroborated testimony in this case, and thus no substantial effect on the outcome.

26  /////

1    Similarly, petitioner was not significantly prejudiced by the exclusion of CALJIC

2 no. 3.18.  An examination of the jury instructions given reveals that jurors were instructed that

3 "[i]n determining the believability of a witness, you may consider anything that has a tendency to

4 prove or disprove the truthfulness of the testimony of the witness, including, but not limited to,

5 any of the following . . . the character and quality of that testimony; . . . the existence or

6 nonexistence of a bias, interest, or other motive; . . . the attitude of the witness toward this action

7 or toward the giving of testimony. . . ."  RT 1051.  Although the jurors were not instructed on the

8 specific dangers inherent in accomplice testimony, they were made aware generally of the need to

9 consider bias or motive for testimony in determining its believability.

10    In sum, the failure to give CALJIC nos. 3.10, 3.11 and 3.18 did not violate

11 petitioner's federal or constitutional rights, and in any event was not so prejudicial as to have a

12 substantial or injurious effect on the outcome of the case. The state Court of Appeal's decision

13 was not contrary to or an unreasonable application of clearly established federal law.

14 VI.  Cumulative Error

15    Petitioner argues there was cumulative error from the combination of errors in this

16 case.  The state Court of Appeal rejected this claim:  "There can be no cumulative error where

17 there has been, at most, only one harmless error."  Answer, Ex. B at 26.

> The cumulative error doctrine in habeas recognizes that, even if no
> single error were prejudicial, where there are several substantial
> errors, their cumulative effect may nevertheless be so prejudicial as
> to require reversal.

21 Parle v. Runnels, 387 F.3d 1030, 1045 (9th Cir. 2004) (internal quotation marks omitted), cert.

22 denied, 544 U.S. 1041 (2005).  Because this court has not found any error, there is no combined

23 impact to evaluate.  The Court of Appeal did not apply federal law unreasonably in rejecting the

24 claim of cumulative error.

25    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

26 writ of habeas corpus be denied.

1      These findings and recommendations will be submitted to the United States

2  District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within

3  fifteen days after being served with these findings and recommendations, any party may file

4  written objections with the court and serve a copy on all parties.  Such a document should be

5  captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the

6  objections shall be served and filed within five days after service of the objections.  The parties

7  are advised that failure to file objections within the specified time may waive the right to appeal

8  the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  DATED:  September 5, 2007.

_____

U.S. MAGISTRATE JUDGE

amc/2  jone1082.2254